Okay, the next case on our docket is 5-14-56, I believe. That's correct. And it's... Well, I can't pronounce that one. Zagorski v. Allstate Insurance. Okay, ready to go? Take your seat. Yes, Your Honor. Operating for Intel and Allstate. You can go. We're ready. These are our first witnesses. May I please report? Mr. Lascari. Your Honor, just by way of very brief background, this case arises out of a dispute over a homeowner fire loss claim. There was a fire at the Zagorski's residence. These Zagorski's presented a claim under their homeowner's policy to Allstate. Allstate investigated the claim and ultimately refused to pay the claim, denied the claim. Based on their investigation, their conclusion that the fire was intentionally set by Mr. Zagorski. So that's sort of the background. The Zagorski's then filed suit against Allstate, St. Clair County Circuit Court. During the initial discovery in the lawsuit, the plaintiffs propounded some interrogatories to Allstate. Which is really what's at issue here. And I'll get into it in a little bit more detail. But generally interrogatories seeking information about other claims, other separate unrelated claims, fire claims that Allstate had handled, been involved in, in the state of Illinois generally. And then also information sought in these interrogatories relating to Allstate's relationship with me and my law firm. So I filed some objections to these interrogatories based on several different grounds. We can put those objections up with Judge Quigley. Yes, Your Honor. When I first saw the briefs, did Allstate say that Mr. Zagorski set the fire? It's not a natural fire. Someone set the fire. That Mr. Zagorski set the fire. They say he did it. Yes, Your Honor. Okay. I won't go into all the evidence. But that was in the brief? That is the allegation that he set the fire. Again, without going into all the evidence. So it's an arson case, Your Honor. I know it's an arson case, but I didn't know if they said he did it. That's the contention. It is. But anyway, these objections to the interrogatories in question taken up, and Judge Quito initially in the circuit court overruled the objections. The order is part of the record before Your Honors. I then filed a motion for reconsideration. By that point, it was with Judge Gleason, if I recall correctly, and the rulings were upheld. And I'll be honest with the court, this is my first time ever having to address or take something this far in the state of Illinois. I've had to file a writ or two. I would say you're in the same room angrily. And the reason I bring that up is because in researching this, it appeared to me that the appropriate method for what we call taking a writ over in Missouri was to seek to have Judge Gleason enter this contempt citation to test the appropriateness. So I was going to say this at the end, but I'll say it now too. Certainly there was no intent to shun or scorn Judge Quito or Judge Gleason. It was just a vehicle by which we wanted to seek appellate review and test the correctness of that underlying discovery order. So anyway, that's how we got here. I know Your Honors have seen the interrogatories that are in question and being contested by me and by all states just very quickly. What was involved, the number of times in the five years prior that all states had been cited by the Illinois Department of Insurance for vexatious delay or improper claims handling. Is that not public record? That may be. I don't think there's any, but there wouldn't be the level of detail. I don't think that Mr. Listeria is seeking. So why didn't you answer some of it? Why didn't you answer that portion that's public? Because I think it's completely and totally irrelevant, Your Honor, and that's what I'm getting to. I don't think it has any bearing whatsoever on any issue in the case. With respect to both that question and the number of times in the last five years that an Illinois court had awarded statutory penalties for vexatious refusal under Section 155. That's public. Yes, it is. And you couldn't answer a public question? I don't think those issues are properly in the case, Your Honor. And I'll go ahead and just jump to the reasoning and my position on that right now, which is as the court is aware, the issues in the case are framed by the pleadings. We have to look to the pleadings to see what issues are actually in the case here. Now, when you look at the pleadings in this case, we have Count 1 of the complaint, the Third Amendment complaint, the one that's at issue, is a count for breach of the insurance contract and also seeking the policy damages and then also seeking penalty and attorney's fees under Section 155 for the alleged vexatious refusal. Is punitive damages available? Not punitive damage. Statutory damage is allowed by Section 155, Your Honor. Only? Only. And that's not even requested in Count 1, Your Honor. What's Count 2? Count 2 is common law fraud. There's punitive damages. I don't believe the punitives are requested in that count. But they're available. Under common law fraud, they would be properly requested. See, the trouble I don't understand is, first of all, you took six months to answer questions. And your answers are basically all the same. Burdensome. Did you put forth any evidence as to why it's burdensome? That's your duty. If you make an objection to burdensome, you have to show the court why it's burdensome. I didn't see anything in your brief that said that. There's nothing in the brief, and that's not what I'm relying on here. And work product privilege or attorney-client privilege, did you submit a privilege log under 201N? We submitted a privilege log, and there was an in-camera review, if I recall correctly, of certain documents by Judge Gleeson at the trial court level, Your Honor. And I think that was during the course of the request to depose me in the case, which that request was denied. But I think that these interrogatories were proffered by Judge Gleeson as an alternative to taking my deposition in the case, as I recall. But, Judge, the main argument that I am making at this point really goes to two points, really. The first one being the relevancy. The second one being the interrogatories relating to all states' relationship with me and my firm as being violative of the attorney-client privilege. I'd like to speak to the relevancy first, if I could, and then getting back to what I was saying in terms of the issues that are actually in the case. When you have the breach of contract claim and the request for the Section 155 penalties, when you really look at those allegations, there's nothing alleged in the plaintiff's third amended complaint about any kind of a pattern and practice of conduct that all state routinely and regularly engages in. In other words, there's no allegation that says, Look, all state does this all the time. All state does this on every fire claim. They engage in a pattern. They engage in a practice. This is what all state does. There's no allegation to that effect whatsoever. The only allegations in Count 1 relate to all states' handling of the Zagorski's claim. That's it. Okay. Well, interrogatories 6 and 9 relate to the Zagorski's claim. I'm sorry, Your Honor. Would you agree that 6 and 9 relate to their claim? I don't have those right in front of me, Judge. The address and profession of each person defendant hired to investigate the cause of the fire, you objected. Why? I mean, your objections are something that we see all the time. You object to everything. Why is it that the name and profession of the person all state hired to investigate the cause of the fire is protected by the attorney-client work product privilege? Judge, if only to the extent that it would be something that was subsequent to the lawsuit, there certainly wouldn't be any objection. And I believe we would have answered anything that occurred during the claim stage. I would agree 100% that they would have a right to know who investigated the insurance claim. Why did you object? There's no question about that because it's not limited to if it's a consultant that I hired during the course of the litigation, then it would be objectionable in my mind. So you – Potentially. So it would have to be something that would be clarified. But that isn't even one of the interrogatories that's at issue here, Your Honor. That's something that certainly we would answer as it relates to what went on during the claim stage. So you're talking about 12, 13, 14, and 15? I'm talking about the ones that ask for information relating to Department of Insurance complaints, information relating to disposition of other court cases, and then the interrogatory – the supplemental interrogatories, the ones that relate to the relationship specifically with me and with Brown and James. Those are the one – the only ones that I'm contesting at this point and the only ones that should be involved here. And so what I was getting to was with respect to count one, when you don't have a – when you're not alleging a systematic pattern of abuse or a pattern and practice of wrongfully denying policyholders benefits or something to that effect, or likewise in that count, there's no allegation of any kind of conspiracy or working in concert with Brown and James to deprive policyholders. I mean, it's – to me, you would have to have some allegations along those lines to open up the Brown and James file or open up my communications or to make the handling of any other claims relevant or even potentially relevant. It just isn't there. The only allegations in count one relate specifically to all states handling of this claim. And then with respect to the common law fraud claim, it's the same thing. When you read that common law fraud claim, the allegation is essentially one statement in a form letter that all states sends out on every one of these claims that – it's just a form blanket statement that says we're here to help you. It's one of these sort of, you know, PR statements that's in a form letter, and the allegation is that's a false statement. All state knew it was false, and the plaintiffs, Zagorski, relied on it to their detriment. Well, they can certainly plead that. But again, that doesn't make what all state did in any other case relevant unless there's some allegation that, you know, again, this is something that all state does all the time. This is a pattern and a practice that all state engages in or all states involved in some kind of a conspiracy with media or with Brown and James to dupe policyholders and lull them into a false sense of security and so on and so forth. So the first argument really relates to relevancy as it relates to all of these contested interlocutories. I would – I'd like to point this out to the court. If you look at the flip side of Zagorski's reasoning here, then it would seem to me that all state and I would be able to defend against a vexatious refusal claim by coming in and saying, all right, well, here's the 5,000 fire claims that we did pay in the state of Illinois in 2010, 2011, 2012. In other words, we've paid all these thousands of claims and we've paid thousands of claims all day every day. And here's 200 Department of Insurance complaints that were made against the company that were resolved in favor of all state with a finding of no misconduct or no mishandling or no citations. Or here's 25,000 customer satisfaction surveys that we had that said the customer was completely satisfied. And can we bring those into evidence? Are those relevant? Here's all the times that all states have been sued and won on a fire case in Illinois over the course of the last five years. I'm not going to stand here and tell you that I think that those things would be relevant because I don't think they're relevant. I think what's relevant here is what was at issue in this claim. What's really at issue here, what's at issue is, was this fire intentionally set by Mr. Zagorski? And then did all state, you know, did all state mishandle this claim? Did all state, you know, did all state improperly, unreasonably mishandle this claim? And when you look at what's requested in the interrogatories that we're contesting, they have no bearing whatsoever on those issues in my mind. So the first argument, again, is relevant. The second argument with respect to the contested interrogatories is that they're violative of the attorney-client privilege. Again, you look at these, when my firm and I communicated with all state, how many times my firm and I communicated with all state. And this isn't just for the Zagorski's claim. This is for any matter within the three years that I or my firm communicated with all state. When, how many times, who within all state we communicated with, the manner of the communication, whether it's verbal, whether it's a letter, whether it's an email, our fee agreement with all state, how much we billed all state. Again, whether it's the Zagorski matter or any other matter, to me, all of this is protected by the attorney-client privilege. It's not just the substance of the communications, Your Honors, but it's also the timing, the method, the manner. All of that information that's being requested goes right to the heart of the attorney-client privilege. And when you combine that with the relevancy argument, that it has nothing to do with any issue in this case and that it's so invasive of the attorney-client relationship, it goes right to the heart of the privilege. So divulging that information would, to me, would make a mockery of the privilege and render it meaningless. The other thing I think that's very significant to point out here is this is not a situation where all state has invoked an advice of counsel defense. I have seen that happen in some cases, sometimes some other states, where an insurance company that takes a coverage position will invoke an advice of counsel defense. And that does open up, arguably, the attorney-client privilege. All state has not raised any kind of affirmative defense of advice of counsel. In other words, all state has not waived and is not waiving the attorney-client privilege. They simply have not. And so that's the additional objection to the interrogatories, the supplemental interrogatories that were served. And then I would just say, again, aside from the relevance, aside from the attorney-client privilege, these types of discovery requests that don't have anything to do with the issues in the case and which seek to invade the attorney-client privilege, disrupt the system, lower the standards of our profession, they detract from the quality of client representation. There's a deterrent chilling effect here if we allow these kinds of interrogatories to stand. You know, does it make me a witness in the case? Does it make Mr. Lascara a witness in the case? Arguably, it might. I don't think we want to go down that road. Back to your point, Your Honor, about the unduly burdensome, it is a situation where there's no practical way that I know of, anyway, in almost 20 years of representing Allstate, you know, to keep track, that they keep track of what's being requested and what would be involved in having to go, you know, back through thousands and thousands and thousands of claim files to find out this information. I mean, it just — Why don't you talk to us about the other interrogatories instead of the attorney-client? There's two issues here. One is your supplemental interrogatories, which you've been talking about, which are asking you to disclose personal information. But there's another set, like producing the policy manual for handling a claim. We've agreed to produce the manual subject to a protective order, Your Honor. That's not an issue. Why is that? That's not an issue. Was it an issue? My position on this case and every other case that I handle like this is there's always an initial objection. Why? Because it's privileged — it's a totally separate thing, Your Honor, but it's privileged, proprietary, intellectual property of the company. As long as there is a protective order, I produce it every time, every time. But that's not what you answer in the interrogatory. We make the objection, and then we work it out with the lawyer, and we say, if you sign a protective order, we will produce it to you, and that's what we do. But is that what the rules say you should do? Is that what Rule 214 or 213 or 201 says you're supposed to do? I think I have the rules allow for me to make an objection that is well-grounded in the law, which I believe this is. Overly broad to produce a manual. That objection, Judge, if you're — I'm just reading your answer. Well, the objection is that it's privileged, proprietary, confidential, intellectual property of the company. It doesn't say that. You say it's burdensome, harassing, irrelevant, not calculated to lead to the discovery of admissible evidence, work product, attorney-client privilege. You've never said that it's proprietary information. I mean, these are typical answers that I used to see all the time, and that all it did was delay. I'm not sure if you're suggesting that that's my intention, Your Honor. I don't know what your intention was. I can assure you that it's not, and those are not the interrogatories. I'm talking about — you talked about your interrogatories with your firm. I understand that objection. But what I don't understand is why you didn't answer these. The only interrogatories that have not been answered at this point are the ones that relate to the five years' worth of information on other claims and the five years' worth of information on Department of Insurance complaints. So the previous losses, other losses. Now, I think what you're looking at, Judge, is initial objections. But we do go ahead and answer and work things out, other than the ones that we have stood on, Your Honor, that I have taken this far are the ones that simply could not be worked out. Okay. So what numbers are those, 12? Because you've told us 12, 13, 14, 15. You forgive me, Your Honor. I have to pull out the brief. Well, that's what we had to do also. And so I don't want to be confused or writing something. Well, I can tell you — it's my error for not putting the number in my notes here, but I can tell you before the court right now that what's at issue are all the supplemental interrogatories, and those relate to the relationship with Brown and James. And then there's one interrogatory that says, you know, every time within the last five years that there has been a Department of Insurance complaint finding a vexatious refusal. And then the last one, Judge, is within five years a court finding a vexatious refusal. Okay. Maybe in your rebuttal you'll give us the numbers. I will. May I please report, counsel? On August 26, 2009, Valentine Zagorski, who was the assistant manager at the Pizza Hut in Collinsville, was at Glidden Park in his son's soccer practice with his wife and his other small kids when his cell phone rang and he was notified that his house was on fire. They rushed home. They found the house on fire. The French Village Fire Department came, concluded that the fire was started by the water heater, advised Valentine and Christina that that was the cause of the fire, and the next thing they did was submit their claim to Allstate. On September the 3rd, Allstate learned through experts it had retained, unknown to the plaintiffs, Prytec, arson investigators in Collinsville, and also Sempke Engineering, where the water heater was sent for evaluation. And Sempke concluded that the water heater was not the source of the fire, and Prytec, together with Sempke, concluded that the fire had been intentionally started. Three days later, Teresa Robinson, who is with Allstate's Special Investigation Unit, contacted the plaintiffs and said she was here to help them, sent them a letter, and said that the purpose of her involvement was to determine the value of the damage to their property and their loss. At no time did Teresa Robinson say, Allstate retained an expert who has concluded that the water heater did not start the fire, or did she ever tell the plaintiffs that she was with the Special Investigation Unit, which only becomes involved when Allstate is suspicious about the fire. She led them to believe that the only purpose, the only thing to do was to see how much they lost, and she gave them a check for $2,000 for living expenses and encouraged them to submit their proof of damages. She gave them a check? Yes, Allstate gave them a check for $2,000 for living expenses. Is that something that's within the policy? It is, to divide them over until the full amount could be determined, all of which lulled them into a sense of security. At that time, when Teresa Robinson was involved, she was suspicious that Valentine Zagorski had started the fire. She never disclosed that to Allstate. Instead, she said, the policy provides you to submit a sworn statement of your loss. And so she therefore took a recorded statement of the plaintiff. And then even after that, she encouraged them to submit their proof of loss, which they did. And then on November 12, 2009, she advised the plaintiffs that Robert Brady would then take an official sworn statement, and that actually the first statement didn't qualify as the sworn proof of loss. But now Mr. Brady would then further take another statement from the plaintiffs. So the plaintiffs then, when this young couple went to Mr. Brady's office, and he took a two-hour statement under oath of Valentine Zagorski and a one-and-a-half-hour statement under oath of Christina Zagorski. And at that time, he became fully aware to both the plaintiffs that Allstate suspected Valentine Zagorski set the fire. Now, at no time did Mr. Brady or Teresa Robinson or anyone say to the plaintiffs, look, we're suspicious. We think that someone else started this fire, and we think it was probably you. Instead, the plaintiffs walked into Mr. Brady's office like lambs going into the lion's den, and therefore he then was able to take statements to get all the evidence that Allstate needed to prove that Valentine Zagorski set the fire. The truth of the matter was that Valentine Zagorski did not set the fire, had nothing to do with the fire, and no one knows who set the fire. But by the time that the Zagorskis realized that they were accused on November 12, 2009, nearly three months had passed since the fire. Everything had been cleaned out of the house. Much of the stuff had been removed. The evidence of which the Zagorskis then needed to establish what actually caused the fire was gone, and the only experts that had a chance to review the circumstances that existed at the time were Allstate's two experts. So all of these circumstances show that Allstate misled the plaintiffs, failed to disclose pertinent information that it had to the plaintiffs, and basically set the plaintiffs up. Scope of discovery in Illinois is anything reasonably calculated to lead to the discovery of indiscipline evidence. Once the trial court concludes that these matters are reasonably calculated, which was done here, then this court would set that order aside only if there was an abuse of discretion, specifically that the trial court decision was clearly against logic. And in this case, the trial court decision was clearly most logical. With respect to the other, the claims and lawsuits, the filings with the Department of Insurance, all of those matters may show that Allstate engaged in the same or similar type behavior with respect to special investigation units with respect to fire investigation claims. And all of the plaintiff's discovery is specifically addressed to fire claims. And it's all reasonable in scope going five years back before the plaintiffs filed. In addition, the information sought from Mr. Brady doesn't attempt to elicit any attorney client information or the nature of the subjects which were discussed with Allstate, but merely when he was initially consulted in this investigation. Did Teresa Robinson begin to speak with him a few days after the fire? If so, that would be further evidence that Allstate was building a case against the plaintiffs and further showing that it had a fiduciary duty to disclose to the plaintiffs that Valentine was suspected to have set the fire. Allstate knowingly misrepresented the facts, concealed this information from the plaintiffs, and this is all evidence which goes to show that their conduct was vexatious and unreasonable. It's allowing the plaintiffs both the punitive damages under count two, common law fraud, which were alleged, and also for damages under section 155. Thank you. Simply stating a vexatious refusal claim under section 155 doesn't give a party a right to go on a fishing expedition. There has to be, you know, when Mr. LaSierra talks about this information that we're seeking regarding the prior lawsuits and regarding complaints the Department of Insurance might show, maybe will show a pattern of similar conduct or similar circumstances. But the thing is, there's no allegation in the Third Amendment complaint to even remotely close to that effect. The only allegation is that Allstate mishandled, unreasonably handled, vexatiously handled the Zagorski's claim. There's no allegation, again, you know, that this is a pattern of practice and that this is what they do on all these claims. Nothing to that effect. Nothing that would open that door, for lack of a better way to say it. Again, there's also no allegation of any kind of conspiracy with Brown and James or with me or anything like that. So I respectfully disagree with Mr. LaSierra that those two particular things, the prior lawsuits and the complaints to the Department of Insurance, are even reasonably calculated to lead to the discovery of admissible evidence. They're not. If he had some allegation that there's some kind of systemic pattern or practice or something like that, then, you know, then maybe arguably we'd be talking about something else here, but we're not. Your Honor, the answer to your question of all of the supplemental interrogatories, that's interrogatories number one through four, that were served according to the certificate of service July 25th of 2012, are at issue at this point. And the initial first interrogatories, it would be numbers 12 and 13. Those were served August the 27th of 2010. The interrogatory 15 was objected to, but that objection was sustained by the trial court. And looking back at it, Your Honor, it also appears to me that the objection to interrogatory number 14, the policy and procedure manual, was also sustained by the trial court. However, I've represented and continue to represent that if there's a protective order put in place, that will be turned over. I agree that it's relevant. I'm not the kind of person, Your Honor, that, you know, I mean, I produce what I'm supposed to produce every time. Every time. But I feel very strongly that this information relating, whenever I try these cases, I file a motion and eliminate it regarding other claims and lawsuits. They simply have, what's really at issue here is, you know, is this claim. You know, two issues. Was there sufficient evidence? Is there sufficient evidence that this fire was intentionally set by Mr. Zagorski? Did Allstate have a reasonable basis to take the position that it took on this claim? That's the contract claim, the policy claim. And then with respect to the vexatious claim, you know, was the claim mishandled? Was there insufficient investigation? Was there not a reasonable basis? Was there unreasonable delay with regard to this claim? But, you know, another way to say this would be, let's say that somebody up in Chicago has an accidental kitchen fire and gets into a fight with Allstate about how much damage was caused and how much money they're owed. The homeowner wants $20,000. The Allstate only wants to pay $10,000. And there's some kind of a complaint made to the Department of Insurance on that. Does that have anything to do, will that have any bearing, be probative in any way, of what happened on Mr. Zagorski's claim? And I submit to you, Your Honors, that it would not. I just don't think there's any relevance there. And then the other, to me, I'm not going to beat a dead horse on the attorney-client stuff. I think that the supplemental and eradicatories are absolutely invasive of the attorney-client privilege. And that's all I'll say with respect to that. The last thing I would say, again, just to drive the point home, I just want to assure the Court, as an officer of the Court, that there was no intent, and I think Judge Gleeson even put it in his order on the friendly contempt citation, that I was not trying to thumb my nose at Judge Guido or Judge Gleeson. It just simply looked to me that this was the proper way to have the underlying discovery order tested and facilitate the appellate review of it. My understanding was that this was the procedure and the process. So I would respectfully ask, Your Honors, that even if you disagree with my position with regard to the underlying orders, that in accordance with the cases that I've read on this, that the contempt citation be set, be vacated, and set aside, and also the fine. Thank you. Thank you, Your Honors.